No. 99,123

STATE OF KANSAS, *Appellee*, v. RASHAWN T. ANDERSON, *Appellant*.

(276 P.3d 200)

Opinion filed May 11, 2012.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, argued the cause, and *Carl Folsom, III*, of the same office, was on the brief for appellant.

*Charles E. Branson*, district attorney, argued the cause, and *Brenda J. Clary*, assistant district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: A jury convicted Rashawn T. Anderson of intentional second-degree murder and reckless aggravated battery for shooting two men on a downtown street in Lawrence following a rap concert. There were several eyewitnesses. The Court of Appeals affirmed his convictions. *State v. Anderson*, No. 99,123, 2009 WL 793019 (Kan. App. 2009) (unpublished opinion).

This court granted Anderson's petition for review to consider whether: (1) the jury was improperly instructed to consider the degree of certainty expressed by an eyewitness when determining if an identification was reliable; (2) the State committed prosecutorial misconduct during closing argument; (3) Anderson's constitutional right to testify was violated because the trial court did not inform him of the right and obtain a waiver on the record; and (4) there was cumulative error.

We hold it was error to instruct the jury on the degree of certainty factor from PIK Crim. 3d 52.20 and that the prosecutor committed misconduct during closing arguments. But we affirm Anderson's convictions because the jury could not have been misled by the instruction under the facts in this case and the prosecutor's comments were harmless.

## FACTUAL AND PROCEDURAL BACKGROUND

During the early morning hours of February 5, 2006, Robert E. Williams was shot five times and killed. Another person, Pierre C. Burnette, was shot once and survived. A jury convicted Anderson of intentional second-degree murder for killing Williams and reckless aggravated battery for shooting Burnette. We detail the events of the crime because it is necessary for our analysis.

The parties do not dispute that during a rap-music concert, Williams and his wife got into an argument with two women. Security personnel escorted the two women from the event, while Williams and his wife were allowed to stay. After the concert Williams left the building, where he got into a dispute with a man named Avery Peppers.

The concert's promoter filmed the concert and the scene outside afterwards, capturing the argument between Williams and Peppers and some audio of Williams' voice. Portions of this video were admitted at trial and played for the jury, but the video is not included in the appellate record. The shootings at issue were not filmed.

The State conceded that Williams drew a small knife, which the State characterized as a pocketknife, during the confrontation with Peppers. The State's theory was that Williams held the knife dis-

creetly until the two were separated. Williams' wife testified that the scene "calmed down" and the argument ceased quickly, although Williams continued talking loudly as he was pulled away from Peppers.

After the altercation with Peppers, Williams was standing on the sidewalk outside of the club eating nachos with a friend, Anthony Martin. At trial, Martin testified that he saw a man get out of a car and approach them. The man was wearing a heavy brown jacket with a hood that prevented them from seeing his face. Martin further testified that the man raised his right arm and shot at Williams, got back into the car, and then drove off while Martin was running away. After the State played the promoter's video for Martin at trial, he identified a man in the video as the shooter based on the jacket.

The other victim, Burnette, was walking towards his car to leave when he heard the gun shots and began running. One shot hit him in the back, creasing his kidney and lodging in his small intestine. Burnette testified he did not see or hear anything before the shots were fired.

Anderson was later identified as the shooter based on the following circumstantial evidence and eyewitness testimony.

Les Paul, a limousine driver whose vehicle was parked on the street outside the concert, testified that he looked into his rearview mirror after hearing shots and saw a slender man with a pullover hoodie run by and jump into a car parked behind the limousine. Paul described that man as the shooter and testified that two other people were already in the car. He also testified the car's driver appeared to be in a hurry to leave because he screeched the tires and almost struck the limousine as he pulled out. Paul recorded the license plate number, which led police to its three occupants: Anderson, Peppers, and Travis Miller.

Miller, who was the driver of the car Paul described, testified that before the shots were fired he was in the vehicle with Anderson and Peppers. Miller said Anderson got out of the car before Miller heard the gunshots. He said Anderson then jumped back in and Miller drove off, returning to Topeka. Miller testified he asked

Anderson something like, "Man, what happened? . . . [y]ou all right?" and Anderson said, "[Y]eah."

Miller at first told the jury that the three men did not discuss the shooting while driving to Topeka, but he later admitted he told prosecutors he had asked Anderson whether he shot Williams, and Anderson denied it. Miller testified further that Anderson's passenger window went down while they were driving to Topeka, but he thought Anderson was "ashing a blunt or something."

Peppers was a passenger in the car and was the same man who had gotten into a confrontation with Williams earlier. He testified that Anderson got out of the car before the shots were fired and returned shortly afterwards. Peppers said the men did not talk about the shooting on the drive to Topeka, but a police detective contradicted this. That officer testified Peppers told him that Anderson admitted sometime during the drive that Anderson had shot Williams and quoted Anderson as saying he had "popped him." Peppers also testified that Anderson rolled down the car window during the drive, but claimed he did not see Anderson throw out a gun. The State attempted to impeach this statement by showing that Peppers had directed the police to a spot along a road where police recovered the gun used in the shooting, along with a DNA sample found on the weapon, which was consistent with Anderson's DNA.

Additional eyewitnesses appeared at trial. Bryce Johnson, a friend who said he considered Williams to be like an uncle, testified he saw the shooting because he heard someone yelling something like "fuck this mother fucker." Then, Johnson said, he watched the shooter run off and get into a nearby vehicle. Johnson said he made eye contact and saw the shooter's face after the shooter ran out of bullets. Johnson described the shooter as a black male with short, braided hair, wearing a brown coat with extra cushion and a hood that had fallen down revealing a hat. Johnson said he recognized the shooter as someone he had seen around but did not know his name.

On cross-examination, Anderson's counsel attempted to impeach Johnson's claim that he saw the shooter by showing Johnson a police report and asking whether he had told police he heard—

but did not see—the shooting. Johnson responded that the report was wrong because he had only told police he did not see the shooting of Burnette, the aggravated battery victim. Defense counsel then attempted to impeach Johnson by introducing evidence that Johnson told police he did not know the shooter. In response, Johnson speculated they must have misunderstood his statements and maintained at trial that he had always recognized Anderson but simply did not know his name.

Johnson's testimony also highlighted how police used the promoter's video during the investigation with some of the witnesses from the scene. Johnson explained that police showed him the video and asked him to identify anyone he recognized. Johnson testified that during this viewing he told the officer to stop the video and then pointed out the shooter by stating something like "that's the MF that did it right there."

Johnson also made an in-court identification of Anderson as the shooter when the State asked whether he recognized the shooter in the courtroom. Johnson said, "Yes, sir." The State then asked Johnson to point him out and describe his clothing. Johnson said, "He has a suit on, dark black suit, green shirt. His hair is cut now but that night he had braids." The State then confirmed for the record that Johnson had identified the defendant.

An additional eyewitness, Damon Jones, testified he saw the shooter, who Jones said was wearing a brown coat. Jones testified he was sitting in a van when he saw a young black male walk along the driver's side of the vehicle. He described this individual as wearing a lighter tan Carhartt jacket, who then "threw his hood on" before shooting Williams. Jones testified further that the shooter ran and got into a car parked behind a limousine. Jones then explained how investigating officers played the promoter's video for him and he was able to identify the shooter on that video because of the jacket. During trial, the video was played for Jones again, and he pointed out the shooter on the video, stating, "Right there. Man right there." But Jones was not asked to identify Anderson as the shooter in court and did not do so.

Anderson's ex-girlfriend, DeShayla Johnson, was not at the concert, but she testified that Anderson told her the day after the

shooting that he "didn't know [he] shot two people," but that he did it because Williams "stepped to his boy and if that was me that he would do the same thing." She also testified that Anderson regularly wore a big and tan waist-length coat prior to the shooting, but she never saw him wearing it again after that.

A detective testified that DeShayla indicated during the investigation that she had seen Anderson's friend, Jamil Fulton, with the jacket after the shooting. Fulton's mother allowed officers to take the jacket after they played her the video, and she agreed the jacket in the video looked like the one her son had. The jacket then was tested for DNA, which showed a partial mixed profile, meaning at least three people contributed to it, with Fulton as the major contributor. The other DNA profiles were insufficient to make a DNA comparison. The jacket was introduced into evidence so the jury could compare it with the coat shown on the promoter's video.

Anderson did not take the stand in his own defense. His counsel disputed the DNA evidence on the gun by cross-examining the lab technician on the technique used to process the evidence in an effort to show the test results were inconclusive. The defense did not call its own expert to contradict the State's DNA testimony. But two witnesses called on Anderson's behalf testified they saw Anderson pick up a gun at someone else's house, but they thought he left the house without the gun.

Following his convictions, Anderson filed a timely appeal to the Court of Appeals arguing: (1) The jury was improperly instructed to consider the degree of certainty expressed by an eyewitness when determining whether the identification was reliable; (2) the State committed prosecutorial misconduct during closing argument; (3) his constitutional right to testify was violated because the trial court did not inform him of that right and get a waiver on the record; and (4) cumulative error. The Court of Appeals held that no error occurred and affirmed his convictions. *Anderson*, 2009 WL 793019.

Anderson petitioned for this court's review, which we granted on all issues. Our jurisdiction arises under K.S.A. 20-3018(b) (review of Court of Appeals' decision).

## ANALYSIS

### (1) *The Eyewitness Identification Instruction*

Over Anderson's objection, the district court issued the cautionary eyewitness identification instruction from PIK Crim. 3d 52.20 without modification. The PIK instruction states:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he) (she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

(1) The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

(2) The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

(3) Whether the witness had observed the defendant on earlier occasions;

(4) Whether a significant amount of time elapsed between the crime charged and any later identification;

(5) Whether the witness ever failed to identify the defendant or made any inconsistent identification;

(6) *The degree of certainty demonstrated by the witness at the time of any identification of the accused*; and

(7) Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." (Emphasis added.) PIK Crim. 3d 52.20.

Anderson argues the district court should have changed the instruction by deleting the sixth "degree of certainty" factor because expressions of certainty by eyewitnesses have been criticized as unreliable by the scientific community. Anderson targets the testimony of Jones and Bryce Johnson with this argument because those witnesses, he contends, were "very confident" in their identifications.

### Standard of Review

When a party objects to an instruction at trial, this court examines whether it properly and fairly states the law as applied to the facts of the case and could not have reasonably misled the jury. In

making this determination, appellate courts consider the instructions as a whole and will not isolate any one instruction. *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009). The use of PIK instructions is not required, but it is strongly recommended unless the facts in a particular case require modification. In those instances, the trial court should not hesitate to make alterations. *State v. Tully*, 293 Kan. 176, 197, 262 P.3d 314 (2011).

*Analysis*

This court addressed a similar challenge to PIK Crim. 3d 52.20 in *State v. Mitchell*, 294 Kan. 469, 275 P.3d 905 (2012). In *Mitchell*, we summarized our prior caselaw treating eyewitness identifications with care and adopting the cautionary eyewitness identification instruction as a procedural safeguard. We reaffirmed in *Mitchell* that district courts are required to issue a cautionary instruction whenever an eyewitness identification is a critical aspect of the prosecution's case and there are serious questions about the identification's reliability. 294 Kan. at 479 (citing *State v. Warren*, 230 Kan. 385, 391, 635 P.2d 1236 [1981]).

Also in *Mitchell*, this court noted that the scientific literature on eyewitness certainty remained inconclusive. We held the degree of certainty factor, as worded in PIK Crim. 3d 52.20, should not be included in jury instructions because it prompts the jury to conclude that eyewitness identification is more reliable when the witness expresses greater certainty. 294 Kan. 469, Syl. ¶ 4.

Applying *Mitchell*, we hold that the trial court erred by issuing PIK Crim. 3d 52.20 without omitting the degree of certainty factor at Anderson's trial. Therefore, we move to the next step in the analysis to determine whether this error could reasonably have misled the jury. We must review the record to see whether an expression of certainty by the eyewitness was communicated to the jury, and, if so, the nature and extent of the certainty expressed. If the court determines there was no degree of certainty conveyed by the witness when making the identification, the jury could not have been misled by including this factor in the instruction. *Mitchell*, 294 Kan. 469, Syl. ¶ 5.

In his testimony, Jones said he watched the promoter's video during the police investigation and was asked to identify anyone he recognized. Jones acknowledged that he could identify the shooter in the video because of the Carhartt jacket. The State then played the video for the jury while Jones was on the witness stand and asked him to point out on the video the individual in the Carhartt jacket, which he did. This allowed the jury to compare the image Jones pointed out on the video with Anderson, who was sitting in the courtroom.

But from the appellate record we are unable to evaluate whether Jones actually identified Anderson's likeness because the video is not included in the appellate record. What is more, Jones did not make any direct in-court identification, so the only evidence Jones gave was pointing out an image on the video. The record does not tell us which image Jones pointed to, the video's quality, or whether the jury could discern any distinguishing features from which to make its own comparison with the defendant. With these limitations, we cannot conclude the eyewitness identification instruction was misleading as to Jones' testimony.

As to the other eyewitness Anderson targets, Bryce Johnson identified Anderson as the shooter on two occasions. First, Johnson identified the defendant in court by describing Anderson's clothing after the State asked whether he saw the shooter in the courtroom. Second, Johnson testified that he pointed out the shooter from the video during the police investigation by stating something like "that's the MF that did it right there."

But Johnson did not express any degree of certainty in either identification beyond the emphasis of the expletive when referring to the video image. And this is not the type of evidence generally associated with the certainty factor contained in jury instructions. See *Mitchell*, 294 Kan. at 482 (witness indicating he was "100 % certain" in his identification). No argument is made or record provided that articulates any body language or demeanor by Johnson that may have conveyed to the jury a level of certainty or confidence in his identification of Anderson. We cannot conclude from this record that the eyewitness identification instruction was misleading as to Johnson's testimony.

But even if we accept the expletive as a form of certainty evidence that the jury may have considered, we still cannot hold that Johnson's in-court identification of Anderson as the shooter was critical to the prosecution's case because there was substantial additional evidence implicating Anderson as the shooter. The strongest of this evidence was Anderson's DNA found on the murder weapon, and Anderson's ex-girlfriend's testimony that Anderson told her he "didn't know [he] shot two people" and that he killed Williams because Williams "stepped to his boy and if that was me that he would do the same thing."

In addition, the State admitted a significant amount of circumstantial evidence and had witnesses who testified that the shooter was wearing a tan or brown waist-length jacket, which Anderson's ex-girlfriend linked to the style of jacket worn by Anderson. Moreover, the video was played for the jury, and the jurors could determine for themselves whether Anderson was the person wearing the jacket that night. Witnesses also testified they saw the shooter get into the car they believed was the get-away vehicle, and Anderson was the only occupant that was not in the car at the time of the shooting.

There are also circumstances that lend reliability to Johnson's identification because it was based on video footage from the night of the shooting and Johnson was able to view the people on the scene, including Anderson, in the clothing worn at the time of the shooting. Johnson also testified on cross-examination that he did not know the shooter's name but was familiar with him because he had seen Anderson before, stating:

"I've seen him but I can't say this is his name, this is who he is because like I was telling [the officer], I don't know if he's either from Topeka or Denver. I said he's either from Topeka or Denver because he's associated with, you know, my boy Doe and people like that. I've seen him around people like that."

In *Mitchell*, the eyewitness testified he knew his attacker, even though he did not know his name, because the attacker previously had stayed in his apartment and the two had interacted on a few other occasions. There was no evidence disputing that claim, although the defendant argued the victim did not know the defend-

ant as well as he claimed. This court held reversal was not required because the identification was sufficiently reliable given the witness' familiarity with the defendant. 294 Kan. at 482-83. And although the extent that a witness is familiar with a defendant will vary in each case, Johnson's claim that he was familiar with Anderson was sufficiently reliable in light of all the evidence. Therefore, we hold that the certainty factor listed in the eyewitness identification instruction could not have reasonably misled the jury.

## (2) *Prosecutorial Misconduct During Closing Argument*

Next, Anderson argues the prosecutor committed misconduct during the State's rebuttal closing argument by improperly appealing to the jury's emotions and vouching for the evidence's credibility. Anderson did not object to the prosecutor's remarks at trial, but a contemporaneous trial objection is not required to review a prosecutorial misconduct claim based on remarks made during voir dire, opening statements, or closing argument. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009).

### *Standard of Review*

Appellate review of an allegation concerning prosecutorial misconduct requires a two-step analysis. First, the court determines whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court determines whether those comments prejudiced the jury against the defendant and denied the defendant a fair trial. This second step requires determining whether: (1) the misconduct was gross and flagrant; (2) the misconduct showed ill will on the prosecutor's part; and (3) the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *State v. Inkelaar*, 293 Kan. 414, 427, 264 P.3d 81 (2011); see *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004).

If the defendant establishes error of a constitutional magnitude, the State has the burden to prove beyond a reasonable doubt that the error did not affect the defendant's substantial rights because the State was the party benefitting from the error. *State v. Hall*,

292 Kan. 841, Syl. ¶ 15, 257 P.3d 272 (2011); *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011).

### The Challenged Comments

The State's prosecution theory was that Anderson shot Williams because he got into an argument with Anderson's friend, Peppers, and the shooting of Burnette was an unintended consequence from Williams' shooting. Anderson denied he was the shooter and argued several people had motive to kill Williams, citing the confrontations Williams had with other people that night.

During closing argument, Anderson's counsel disputed that Anderson was the shooter and emphasized that Williams was loud, carried a knife, and had gotten into confrontations with several different people the night he was killed. Defense counsel also argued that whoever killed Williams did it in the heat of passion, stating:

"Well the man who got shot is a man who was armed with a pretty dangerous knife, man who had carried the knife hidden as he approached, somebody with whom he had been arguing. He actually follows the guy, kind of tracks the guy down, so would a reasonable observer . . . perceive Mr. Williams as a potential threat, a serious potential threat. Don't you think so?"

In rebuttal, the prosecutor noted that Williams was not on trial. She also stated:

"Now, you know, on that night Robert Williams didn't have to die. And he didn't certainly didn't deserve to die to be gunned down and to die in the street without any dignity. But despite the fact that he had a knife and he had it tucked away and in his pants pocket at the time he was shot, despite that fact that he was still defenseless. He was defenseless because his guard was down. . . . He didn't know the defendant was pulling up in a car in the street, saw him, jumped up, came up from behind him with a gun and was able to start shooting at him. . . . But, you know, he was defenseless. At that point he was taken by surprise when shot in the back but *he's not defenseless today because he has the criminal justice system with him and he has the truth with him. The truth will be his redemption here in this courtroom.*

"So we ask ourselves why did [Anderson] shoot and kill Robert Williams? Was it because he was trying to be a big man? Trying to show that he wasn't afraid of anyone? Trying to show that no one disrespects his boy? That he isn't going to let someone pull a knife and argue with one of his friends? You know premeditation was interrupted. It was. But he picked it up again first chance he had. But he's

not a big man. *He's a little, little man who used a cowardly ambush in order to shoot and kill a man, father, son, a brother and a husband who had no idea it was coming.*" (Emphasis added.)

The Court of Appeals held these comments were not improper because the evidence established that Williams was shot in the back five times while standing in the street, and Anderson's ex-girlfriend testified that Anderson told her he shot Williams because he "stepped to his boy." The Court of Appeals essentially found that the prosecutor's statements were provoked and made in response to defense counsel's statement. *Anderson*, 2009 WL 793019, at *2. We agree that the substance of the prosecutor's argument properly summarized the evidence, but we find the italicized comments were nevertheless improper.

In closing argument, a prosecutor may comment on admitted evidence as long as the remarks accurately reflect the evidence, accurately state the law, and are not intended to inflame the jury's passions or prejudices or divert the jury from its duty to decide the case based on the evidence and controlling law. *State v. Raskie*, 293 Kan. 906, Syl. ¶ 3, 269 P.3d 1268 (2012). The statement that the victim's "redemption" would come with a guilty verdict is an appeal to emotion that attempts to pressure a verdict from the jury out of pity for the victim, rather than the defendant's guilt, and is an attempt to divert the jury's attention from the evidence. This statement is akin to the prosecutor's call to the jury to tell a child rape victim that "she did the right thing" by reporting the crime and an appeal to give the victim justice. See *State v. Martinez*, 290 Kan. 992, 1013-14, 236 P.3d 481 (2010) ("There is no question the prosecutor's closing remark injects irrelevant decision-making into the jury process."); *State v. Nguyen*, 285 Kan. 418, 425, 172 P.3d 1165 (2007) (touchstone is whether the argument seeks to divert the jury from the evidence and obtain a conviction based on sympathy); *State v. Henry*, 273 Kan. 608, 641, 44 P.3d 466 (2002) (reference to mother's grief designed to inflame jury's passions). We hold that the prosecutor's "redemption" comment, coupled with the demeaning reference to defendant as "a little, little man," constitute improper statements, so we move to the second step of

the prosecutorial misconduct analysis to determine whether Anderson was denied a fair trial.

It is a close call whether these comments, taken together, were gross or flagrant or demonstrated ill will. The comment that defendant is "a little, little man," obviously is demeaning, and it seems equally obvious that it is improper to imply that a conviction will serve as the victim's redemption. But there was substantial evidence of Anderson's guilt, and it is unlikely these isolated comments, which were in rebuttal and not part of an obvious pattern of misconduct by the prosecution, would have affected the jury's determination. Thus, we hold that the prosecutor's statements were improper, but that the error does not require reversal of Anderson's convictions.

### (3) *Sua Sponte Inquiry Into Anderson's Right to Testify*

Anderson argued for the first time on appeal that his constitutional right to testify was violated because the record does not affirmatively show he was advised of the right to testify or that he knowingly waived it. The State argues that trial courts do not have a duty to *sua sponte* address a defendant and inquire whether he knowingly waived his right to testify, citing *Taylor v. State*, 252 Kan. 98, Syl. ¶ 5, 843 P.2d 682 (1992). The Court of Appeals accepted the State's position. We agree and reaffirm our *Taylor* decision.

### *Standard of Review*

Appellate courts review whether a constitutional right was violated de novo. See, *e.g.*, *State v. Noah*, 284 Kan. 608, 612, 162 P.3d 799 (2007) (reviewing issues pertaining to Confrontation Clause de novo); *In re J.D.C.*, 284 Kan. 155, 162, 159 P.3d 974 (2007) (considering whether due process was violated is reviewed de novo).

Generally, constitutional grounds for reversal are not properly before an appellate court if not addressed by the district court. But an appellate court may consider a constitutional issue raised for the first time on appeal if it falls within three recognized exceptions: (1) the newly asserted claim involves only a question of law arising on proved or admitted facts and is finally determinative of

the case; (2) the claim's consideration is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court's judgment may be upheld on appeal despite its reliance on the wrong ground or reason for its decision. *State v. Perez*, 292 Kan. 785, 789, 261 P.3d 532 (2011). Supreme Court Rule 6.02(e) (2011 Kan. Ct. R. Annot. 39) provides that if an issue was not raised in district court, the appellant must explain why that issue should be considered for the first time on appeal.

In his appellate brief, Anderson complied with the rule by noting this issue was not raised below, that it involved Anderson's fundamental right to testify, and was a pure legal question. He also referred to the three factors permitting consideration of an issue for the first time on appeal and argued the first two warranted this particular issue's consideration. The State did not dispute the applicability of the exceptions, and the Court of Appeals simply addressed the issue on the merits without determining whether any of the exceptions applied. Under these circumstances, we find that Anderson's arguments that the two exceptions apply warrant our consideration of the issue for the first time on appeal.

*Analysis*

The United States Supreme Court has held that a criminal defendant has a constitutional right to testify on his own behalf under the United States Constitution's Fourteenth Amendment Due Process Clause, the Sixth Amendment Compulsory Process Clause, and the Fifth Amendment's guarantee against compelled testimony. *Rock v. Arkansas*, 483 U.S. 44, 51-53, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); see *State v. Rice*, 261 Kan. 567, 611, 932 P.2d 981 (1997) (recognizing constitutional right to testify). But the United States Supreme Court has not decided whether trial courts have a duty to advise the defendant of that right and get an affirmative wavier on the record.

There is a split of authority among jurisdictions on this issue. *State v. Tuplin*, 901 A.2d 792, 797 (Maine 2006). Some have held that trial courts must inquire whether the defendant understands he or she has a right to testify and he or she wishes to waive it. See, *e.g.*, *LaVigne v. State*, 812 P.2d 217, 219-22 (Alaska 1991);

*People v. Curtis*, 681 P.2d 504, 511-12 (Colo. 1984). Other juris-dictions have held that trial courts are not required to inquire whether a defendant waives the right, but it is recommended. See, *e.g.*, *State v. Gulbrandson*, 184 Ariz. 46, 64-65, 906 P.2d 579 (1995); *Barron v. State*, 264 Ga. 865, 866 n.2, 452 S.E.2d 504 (1995). And some jurisdictions have held that trial courts are not required to make that inquiry because it may threaten the defend-ant's right against self-incrimination or involve the court in trial strategy. *United States v. Pennycooke*, 65 F.3d 9, 11 (3d Cir. 1995); *Siciliano v. Vose*, 834 F.2d 29, 30 (1st. Cir. 1987); *State v. Antoine*, 564 N.W.2d 637, 639 (N.D. 1997).

This court adopted the third approach in *State v. McKinney*, 221 Kan. 691, Syl., 561 P.2d 432 (1977), and that holding was reaf-firmed in *Taylor*, 252 Kan. at 106, with Justice Lockett dissenting on the issue. See *State v. Rowell*, 256 Kan. 200, 212-13, 883 P.2d 1184 (1994), *overruled on other grounds State v. Shadden*, 290 Kan. 803, 235 P.3d 436 (2010).

In *Taylor*, the defendant filed a K.S.A. 60-1507 motion alleging ineffective assistance of trial counsel because he was denied his constitutional right to testify. He argued a silent record was insuf-ficient and that the trial court was required to inquire on the record whether Taylor knowingly and voluntarily waived the right to testify at trial. This court held no duty to inquire exists, stating:

"A trial court has no duty sua sponte to address a silent defendant and inquire whether he or she knowingly and intelligently waives the right to testify. An ex-press waiver, on the record, is not necessary because a defendant's conduct pro-vides a sufficient basis from which to infer that the right to testify is waived. There is a danger that by asking a defendant if he or she is aware of his right to testify, a trial court may inadvertently influence a defendant to waive the equally funda-mental right against self-incrimination." 252 Kan. 98, Syl. ¶ 5.

The *Taylor* court cited seven reasons for finding a duty to inquire does not exist: (1) the right to testify must be asserted to be rec-ognized; (2) the decision to testify must be made at trial, and the failure to testify cannot be raised as an afterthought; (3) the court could influence the defendant to waive his or her right not to testify by advising him or her of the right to testify; (4) the trial court may improperly intrude on the attorney-client relationship; (5) the

judge's admonition may introduce trial error; (6) it is difficult to determine the appropriate time for the admonition; and (7) the judge should not interfere with trial strategy. 252 Kan. at 106 (quoting *United States v. Martinez*, 883 F.2d 750, 760 [9th Cir.1989], *vacated on other grounds* 928 F.2d 1470 [9th Cir.], *cert. denied* 501 U.S. 1249 [1991]). See also *State v. Bell*, No. 101,903, 2011 WL 3444200 (Kan. App. 2011) (unpublished decision), *rev. denied* 293 Kan. 1108 (2012) (considering defendant's argument that trial court's inquiries to ensure knowingly waiver of right to testify was error).

We find no reason to depart from the *Taylor* court's rationale now. We hold Anderson's constitutional right to testify was not violated when the trial court did not ask Anderson whether he understood his right to testify and get an affirmative waiver on the record.

### (4) *Cumulative Error*

Finally, Anderson argues that the cumulative effect of trial errors warrants reversal, even if the errors are individually insufficient to require reversal.

When conducting a cumulative error analysis, an appellate court aggregates all errors, even though those errors were individually considered harmless. The question presented is whether the defendant's right to a fair trial was violated because the combined errors affected the trial's outcome. If any of the errors aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt. *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

When assessing whether cumulative errors are harmless, appellate courts examine the errors in the context of the record as a whole "considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." 293 Kan. at 205-06. Prejudicial error will not be found under the cumulative effect rule if the evidence is overwhelming against the defendant. 293 Kan. at 206.

In Anderson's case, we have found two errors. First, the district court issued the cautionary eyewitness identification instruction without deleting the degree of certainty factor. But we held that error was not individually reversible because the instruction could not have misled the jury in this case. Second, the prosecutor made some improper comments, which we also held did not require reversal.

The errors committed were unrelated, and the prosecutor's improper comments were a minor misstep during rebuttal argument. Moreover, given the evidence against Anderson, we are satisfied beyond a reasonable doubt that any cumulative impact from these errors was harmless. Therefore, we hold the cumulative error doctrine does not require reversal in this case.

Affirmed.