NOT DESIGNATED FOR PUBLICATION

No. 123,438

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN STENBERG,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Gray District Court; SIDNEY R. THOMAS, judge. Opinion filed February 25, 2022.
Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Curtis E. Campbell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., CLINE, J., and RACHEL PICKERING, District Judge, assigned.

PER CURIAM: A jury convicted John Stenberg of one count of rape, two counts of aggravated criminal sodomy, and one count of aggravated indecent liberties with a child, and this court affirmed his convictions on appeal. Stenberg has now filed a motion under K.S.A. 60-1507, asserting that his trial counsel was ineffective. The district court held an evidentiary hearing where both Stenberg and his trial attorney testified. The court later denied Stenberg's motion. After carefully reviewing the record and the parties' arguments, we affirm.

1

In January 2014, the State adjudicated siblings to be children in need of the State's care. As a result, sisters K.P., age five, and A.P., age three, and their older brother were placed in foster care. Previously, the children lived in a home with their mother, Stenberg (their stepfather), and several of Stenberg's adult children and his wife's extended family. The State removed K.P. and A.P. from the home after an incident involving one of Stenberg's sons; those allegations did not involve Stenberg.

After a few months in foster care, K.P. made a spontaneous statement at dinner that "Daddy John put his pee-pee on my pee-pee." K.P. did not elaborate further, but her foster parent was concerned and reported the statement to an abuse hotline. At dinner about a week later, A.P. spontaneously stated that "Daddy John put his pee-pee in her mouth," and K.P. replied, "I didn't let him do that to me." Their foster parent again reported these statements to the abuse hotline. Later in foster care, the girls also said that Stenberg made them get in bed naked with him.

Shortly after the initial disclosures, Kansas Bureau of Investigation Special Agent Bethanie Popejoy interviewed K.P. and A.P. individually. For both girls, Agent Popejoy started with a rapport-building phase to ensure that the girls could identify family members—including Stenberg—and that they knew what different body parts were. Despite at first confusing "Daddy John" and "Daddy Chris" (their biological father who lived out of state), K.P. told Agent Popejoy that "Daddy John put his pee-pee in my pee-pee." She said this occurred multiple times when she was four. K.P. also acted out a sexual position when describing what Stenberg did and used anatomically realistic dolls to demonstrate it to Agent Popejoy.

A.P. went through the same process and, though she was more hesitant to talk to Agent Popejoy, after some prompting she eventually stated that Stenberg had "put his

2

wee-wee in her mouth" and on her "pee-pee" more than once. Using the dolls to show Agent Popejoy, A.P. mimicked oral and vaginal sexual contact.

Based on these interviews, Gray County Undersheriff Jeff Sharp interviewed Stenberg, who was in custody serving a sentence on an unrelated matter. Stenberg waived his *Miranda* rights and denied the accusations for most of the two-hour interview. But Stenberg ultimately confessed to sexually abusing both girls—K.P. once and A.P. twice. As a result, the State charged Stenberg with multiple off-grid sex crimes.

Stenberg's attorney, Peter Antosh, filed several pretrial motions, including a motion to suppress the confession, a motion to appoint a psychiatric expert to evaluate Stenberg, and a motion for a psychiatric evaluation of K.P. and A.P. And the State moved to admit evidence of Stenberg's criminal history; Stenberg was already a registered sex offender because of multiple sex-related offenses.

The district court held a hearing to address these pretrial motions. It denied Stenberg's motion to suppress and motion to evaluate the victims, and Stenberg withdrew the motion to evaluate himself. The court granted the State's motion to admit Stenberg's previous bad acts under K.S.A. 60-455(d)—including several California convictions for exposing himself in the 1980s, a protective order for inappropriate contact with an intellectually disabled minor, and a recent conviction for masturbating in a Walmart.

The case went to trial in January 2016. The jury heard about the victims' initial disclosures from their foster parent, and Agent Popejoy testified about the forensic interviews, videos of which were admitted into evidence. The jury also heard from the victims themselves; K.P. and A.P.—then ages seven and five—testified about the allegations against Stenberg. Finally, Undersheriff Sharp testified about Stenberg's confession. Stenberg chose not to testify and did not put on any evidence. The State did

3

not end up presenting evidence of Stenberg's previous offenses, but the jury nevertheless convicted Stenberg as charged.

At sentencing, Stenberg maintained his innocence and did not request a sentencing departure for any of the four convictions, which were all off-grid crimes with presumptive life sentences. The district court sentenced Stenberg to life imprisonment with the possibility of parole after 25 years on each of the four convictions, with two of the counts to run consecutively.

This court affirmed Stenberg's convictions on direct appeal. *State v. Stenberg*, No. 116,026, 2017 WL 4455307 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. 993 (2018). The main issue on appeal concerned Stenberg's motion to suppress his confession. Although the panel found that some of the interview tactics were problematic, it determined that on balance the confession was voluntary. The panel vacated an illegal lifetime postrelease supervision portion of Stenberg's sentence but otherwise affirmed all convictions and sentences. 2017 WL 4455307, at *12-13.

When his appeal concluded, Stenberg moved for postconviction relief under K.S.A. 60-1507 asserting, among other things, that Antosh provided constitutionally defective representation at trial. The district court appointed counsel to represent Stenberg on the motion, and the parties narrowed the issues to be considered. Stenberg continued to assert that Antosh was ineffective for

- failing to prepare Stenberg to testify;
- failing to investigate and call potential defense witnesses;
- failing to call an expert to review the victims' forensic interviews; and
- failing to perform certain pre and posttrial functions, including filing a departure motion at sentencing.

4

The district court held an evidentiary hearing on Stenberg's motion in June 2020, where both Stenberg and Antosh testified. Stenberg stated that he provided Antosh with a list of potential witnesses for his defense, and Antosh failed to contact any of the people on that list. Stenberg also stated that Antosh did not prepare him to testify at all and only broached the issue in passing in the middle of the trial.

During his testimony, Antosh explained that his case strategy centered on the motion to suppress Stenberg's confession. When that effort was unsuccessful—meaning Stenberg's confession would be presented to the jury—Antosh felt that Stenberg's likelihood of prevailing at trial was slim. He concluded that the best strategy was to hold the State to its burden of proof and seek review of the suppression issue on appeal. As to the four allegations in Stenberg's K.S.A. 60-1507 motion:

- Antosh stated that Stenberg knew he had a right to testify but chose not to based on Antosh's advice. Antosh felt that Stenberg would not be a compelling witness and that his testimony could have abandoned any appeal of the suppression issue.

- Antosh acknowledged that he did not call the people on Stenberg's list of potential witnesses. He explained that the people Stenberg identified were character witnesses—a point Stenberg disputes—whose testimony would have invited the State to admit evidence of Stenberg's previous sex crimes.

- Antosh testified that he did not consider calling an expert to review the girls' interviews because both K.P. and A.P. testified at trial. Antosh also indicated that he did not think an expert would have made a difference at trial, given Stenberg's confession to the crimes.

- Antosh indicated he did not file a departure motion because he felt that it would conflict with Stenberg maintaining his innocence.

After the hearing, the district court denied Stenberg's motion. The court found Antosh more credible than Stenberg and thus believed that Antosh adequately prepared Stenberg to testify if Stenberg had chosen to. The court also found that Antosh's decision not to investigate character witnesses was sound strategy given Stenberg's history, and that expert review of the victims' interviews would make no difference because they testified at trial. The court did not directly address the departure issue, other than to say there was no factual support for the allegation that Antosh failed to perform certain pretrial and posttrial functions. On the whole, the court determined that Antosh acted reasonably and, even so, there was no prejudice given Stenberg's confession. Stenberg appeals.

DISCUSSION

Stenberg's overarching argument on appeal is that Antosh's representation was constitutionally defective because he did not have a backup plan after the district court denied the motion to suppress. Stenberg asserts that this strategy—or lack thereof—is shown by the same four grounds raised below: failing to prepare Stenberg to testify, failing to investigate Stenberg's proposed witnesses, failing to consult an expert about the victims' interviews, and failing to file a departure motion. The State counters that these were reasonable strategic decisions by Antosh, and Stenberg cannot show prejudice because of the strength of the other evidence at trial—especially the confession and the victims' testimony.

When a district court denies a K.S.A. 60-1507 motion after holding an evidentiary hearing—as the district court did here—appellate courts review factual findings for substantial competent evidence, then determine whether those findings support the district court's legal conclusions. *State v. Adams*, 297 Kan. 665, Syl. ¶ 1, 304 P.3d 311 (2013). "Substantial competent evidence is legal and relevant evidence a reasonable

6

person could accept to support a conclusion." *State v. Talkington*, 301 Kan. 453, Syl. ¶ 3, 345 P.3d 258 (2015). Appellate courts do not reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts. 301 Kan. 453, Syl. ¶ 3. Legal conclusions are subject to unlimited review. *Adams*, 297 Kan. 665, Syl. ¶ 1.

The Sixth Amendment to the United States Constitution guarantees criminal defendants "the assistance of counsel" for their defense. U.S. Const. amend. VI. This assistance must be "reasonably effective," because the failure to provide effective assistance of counsel deprives a defendant of a fair trial in violation of the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

To determine whether an attorney's performance constitutes ineffective assistance of counsel, courts examine whether the attorney's representation was deficient and whether any constitutionally defective representation prejudiced the defendant. 466 U.S. at 687. That is, the defendant must show (1) the attorney's actions were objectively unreasonable under the totality of the circumstances, and (2) but for those actions, there is a reasonable probability that the outcome would have been different. 466 U.S. at 687; *Chamberlain v. State*, 236 Kan. 650, Syl. ¶ 3, 694 P.2d 468 (1985) (adopting *Strickland*).

Under *Strickland*'s effectiveness inquiry, courts' review of an attorney's actions is "highly deferential"; in other words, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Chamberlain*, 236 Kan. 650, Syl. ¶ 3. Courts must examine the representation from the attorney's perspective at the time of trial "'to eliminate the distorting effects of hindsight.'" *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012). Matters of trial strategy, such as what witnesses to call or what motions to file, are decisions for the attorney, and courts will defer to the attorney's discretion. 294 Kan. at 838-39. Other decisions, such as whether a defendant will testify, are ultimately up to the defendant. 294 Kan. at 838.

*Strickland*'s second consideration—its analysis of prejudice—focuses "'on the fundamental fairness of the proceeding.'" *Balbirnie v. State*, 311 Kan. 893, 900, 468 P.3d 334 (2020) (quoting *Strickland*, 466 U.S. at 696). To show a reasonable probability that the outcome would have been different but for an attorney's deficient representation, there must be "'a probability sufficient to undermine confidence in the outcome.'" *Chamberlain*, 236 Kan. at 655. Appellate courts must consider all the evidence before the jury, with prejudice more likely when the verdict has little evidentiary support rather than a verdict "'with overwhelming record support.'" *Balbirnie*, 311 Kan. at 899 (quoting *Strickland*, 466 U.S. at 695-96).

Against this backdrop, Stenberg asserts that Antosh's performance was deficient under *Strickland* because Antosh failed to prepare him to testify, failed to investigate Stenberg's desired witnesses, failed to consult an expert to refute Agent Popejoy's testimony about the victims' interviews, and failed to request a sentencing departure. And Stenberg argues that these deficiencies—symptoms of an overall lack of trial strategy—prejudiced Stenberg because they fundamentally undermine confidence in the jury's verdict. We consider each of these allegations in turn. For the reasons we explain here, we agree with the district court that Stenberg has not demonstrated that Antosh's representation was ineffective. And even though some of Antosh's decisions were not strategic and were arguably deficient, Stenberg has not demonstrated that those actions had any impact on the outcome of the proceedings or deprived him of a fair trial.

1. *Stenberg's preparation for trial and decision whether to testify*

Stenberg first challenges the district court's finding that Antosh adequately prepared Stenberg to testify. Stenberg admits he chose not to testify, but he asserts, consistent with his statements at the evidentiary hearing, that he made that decision because Antosh did not prepare him for trial.

Under the United States Constitution, a criminal defendant has a right to testify in his or her own defense. *State v. Anderson*, 294 Kan. 450, 465, 276 P.3d 200 (2012). At the evidentiary hearing on Stenberg's motion, Stenberg testified that Antosh did not prepare him to testify at all. According to Stenberg, Antosh first discussed the issue with Stenberg in the middle of trial, and because of the lack of preparation and Antosh's advice, Stenberg felt unprepared. Thus, even though he wanted to testify, he decided not to do so.

Antosh testified that he spent 11.3 hours meeting with Stenberg to prepare their case, including a 2.5-hour meeting two days before trial. He explained that he knew after meeting Stenberg earlier in the case that he did not want Stenberg to testify and did not believe Stenberg would be an effective witness. According to Antosh, at the meeting two days before trial, he discussed with Stenberg whether Stenberg should testify. Antosh maintained that it would be a "terrible idea" because of the likelihood that Stenberg's testimony would put into evidence parts of the confession that the parties had redacted for the jury. At no point did Stenberg take issue with this advice or insist on testifying. And during trial, the district court specifically set aside time for Antosh and Stenberg to speak privately in chambers after the State's case-in-chief. Right after that meeting, Stenberg confirmed on the record that he was exercising his right not to testify.

The district court heard both accounts of these events at the evidentiary hearing and found Antosh's explanation—not Stenberg's—to be credible. Appellate judges, who are removed from these proceedings, cannot reassess those credibility determinations. *Talkington*, 301 Kan. 453, Syl. ¶ 3. Though Stenberg may dispute Antosh's testimony, the attorney's account provides substantial competent evidence to support the district court's finding that Antosh adequately prepared Stenberg to testify. Thus, Stenberg has not shown any deficiency in Antosh's representation as it related to Stenberg's decision whether to testify at trial.

9

2. *Investigation of potential defense witnesses*

Stenberg next argues that the record does not support the district court's findings regarding the names of potential witnesses he provided to Antosh. Antosh testified, and the district court found, that these individuals all would have been character witnesses and thus would have invited rebuttal evidence about Stenberg's past sexual misconduct. The district court found that this concern rendered Antosh's failure to investigate the witnesses reasonable. Our review of the record shows that some of these individuals may have provided information other than character evidence—a matter the attorney could have learned if he had followed up with those people. But Stenberg still has not shown that any information gleaned from these potential witnesses would undermine our confidence in the fairness of his trial.

As background, Stenberg sent Antosh a list of several individuals before trial. Stenberg indicated that Antosh should contact these people—all Stenberg's family and friends—as potential defense witnesses. Antosh never contacted any of them, believing they were all character witnesses who could hurt Stenberg's case. The witnesses were:

- Stenberg's sons, who could testify about Stenberg's relationship with the victims;

- Stenberg's brother-in-law, who could testify about Stenberg's relationship with the victims and the fact that Stenberg was never alone with them;

- Stenberg's mother-in-law, who could testify about the victims' mannerisms;

- Stenberg's children's cousin, who could testify about Stenberg's care of and relationship with the victims; and

10

- Two of Stenberg's friends, who could testify that the victims had once witnessed a sexual act and then acted it out.

In his appeal, Stenberg admits that most of these witnesses would testify to his character. But he argues that at least three would provide factual testimony—about him never being alone with the victims and their previous exposure to sexual acts.

Deciding which witnesses to investigate and call is a strategic decision—the province of the attorney, not the client—on which courts will generally defer to the attorney. *Sola-Morales v. State*, 300 Kan. 875, 887, 335 P.3d 1162 (2014). Stenberg has the burden to show that the failure to call witnesses was an uninformed decision that was "not the result of strategy." 300 Kan. at 888.

It is true that many of the witnesses' testimony would have described Stenberg's character—that is, his relationship with the victims and his care for them as a stepfather. Despite the court's pretrial ruling that Stenberg's criminal history was admissible, the State chose not to introduce it in its case-in-chief. Antosh felt that if the State had introduced that evidence under K.S.A. 60-455(d), Stenberg could challenge that decision on appeal. But had Antosh called character witnesses, the jury likely would have learned about Stenberg's history and Stenberg would have waived any chance to appeal the pretrial order. See K.S.A. 60-447 (State can introduce character evidence to prove guilt if the defendant opens the door by admitting evidence of his own good character). Thus, we agree with the district court that Antosh's decision not to pursue the testimony of character witnesses was reasonable in light of the facts of this case.

At the same time, we agree with Stenberg that not *all* the proposed witnesses would have been character witnesses. In particular, at least three of these witnesses—his brother-in-law and his two friends—could have provided fact testimony that would not necessarily have invited rebuttal character evidence. Evidence that Stenberg was never

11

alone with the victims could have directly contradicted the allegations underlying his convictions, and evidence that they had witnessed and acted out sexual conduct could have provided an alternative explanation for why girls who are so young would have information regarding sexual acts. While it is unrealistic to expect attorneys to investigate every potential witness throughout the case, the failure to contact these witnesses at all to discuss their potential testimony deprived Antosh of the ability to make a meaningful decision as to whether to call them at trial.

This does not mean, however, that the attorney's inaction undermined the fairness of Stenberg's trial—the ultimate question posed by *Strickland*. As Antosh explained at the evidentiary hearing, none of these witnesses could meaningfully refute the abuse in light of Stenberg's confession. The brother-in-law's testimony is particularly implausible, given that Stenberg himself admitted to being alone with the girls several times in his interview with law enforcement. Such testimony also could easily veer into character-evidence territory as part of broader testimony about Stenberg's relationship with the victims. And Stenberg's confession also would have undermined his friends' testimony regarding how the girls knew about sexual acts. While we question Antosh's decision not to contact the witnesses at all, Stenberg has not shown that these witnesses' testimony would have led to a different outcome at trial.

The evidence showed that the parties directly involved in these crimes—Stenberg and the victims—all stated that he was alone with them when he sexually abused them. Conflicting testimony from an extended family member or a friend would not have a probability of changing the jurors' minds given the overwhelming direct evidence to the contrary. Stenberg has not shown a reasonable probability that the verdict would be different had the jury heard these witnesses' testimony.

12

3. *Consulting an expert about the victims' KBI interviews*

Stenberg next argues that Antosh was ineffective for not consulting an expert to review K.P.'s and A.P.'s forensic interviews with Agent Popejoy. He asserts that the record does not support the district court's findings that an expert would not have offered anything relevant because both K.P. and A.P. testified at trial. Antosh admits that he did not think to obtain an expert in this case and that hiring an expert "probably . . . wouldn't [have] hurt."

In support of this argument, Stenberg primarily relies on *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002). In *Mullins*, this court found that it was unreasonable not to consult—or even look for—an expert to review a young sexual abuse victim's statement to determine whether that statement was reliable. 30 Kan. App. 2d at 717-18. The uncontroverted evidence from the K.S.A. 60-1507 hearing in that case showed that the use of experts to review disclosures by child victims was "crucial." 30 Kan. App. 2d at 717. And *Mullins* found there was prejudice under *Strickland* because without expert consultation, "the jury heard only the victim's unchallenged allegations of abuse." 30 Kan. App. 2d at 718; see also *State v. Huntley*, 39 Kan. App. 2d 180, 187-89, 177 P.3d 1001 (2008) (reading *Mullins* to suggest that such expert testimony would be admissible).

Other panels since *Mullins* have limited that case to its facts—where there was no evidence, save the young victims' interviews, to support the allegations—and found it distinguishable. See, e.g., *State v. Lewis*, 33 Kan. App. 2d 634, 651, 111 P.3d 636, *rev. denied* 277 Kan. 924 (2003); *Randolph v. State*, No. 116,765, 2017 WL 6072956, at *5-6 (Kan. App. 2017) (unpublished opinion), *rev. denied* 308 Kan. 1595 (2018); *Hall v. State*, No. 109,168, 2014 WL 1096748, at *6-8 (Kan. App. 2014) (unpublished opinion). These cases have identified several key facts present in *Mullins* that commanded its result. There were no witnesses to the abuse and the victim had no visual signs of it; the victim's

13

physical exam was normal; the defense failed to call an expert to rebut the victim's testimony; the State emphasized the correctness of police interviewing techniques; and the expert commented on the victim's credibility. See *Lewis*, 33 Kan. App. 2d at 647-48; *Randolph*, 2017 WL 6072956, at *5-6. And expert testimony is more likely necessary in a case with very young victims, rather than older or teenage victims. *Hall*, 2014 WL 1096748, at *7-8.

We acknowledge that some of these considerations are present in this case. There were no witnesses to the abuse and there is no evidence of visual signs of abuse on K.P. or A.P. The defense did not call an expert to rebut their testimony. And both K.P. and A.P. were very young when they gave their KBI interviews. Agent Popejoy also commented on the victims' credibility, stating that although she had left other interviews feeling that allegations were unsupported, she believed that K.P.'s and A.P.'s "allegations were supported by the testimony." Under these circumstances, the better course—as Antosh acknowledged in his testimony—would have been for Antosh to consult an expert concerning the girls' suggestibility.

But there is at least one significant fact here that distinguishes this case from *Mullins*' prejudice analysis and thus commands a different result—Stenberg's confession. The jury in this case did not hear "only the victim's unchallenged allegations of abuse." *Mullins*, 30 Kan. App. 2d at 718. Instead, after hearing of several consistent disclosures of sexual abuse, the jury learned that Stenberg himself admitted to the charged conduct.

Thus, although the evidence does not support the district court's determination that Antosh acted reasonably by failing to even consider consulting an expert, Stenberg has not shown that this omission prejudiced his case. In fact, he fails to address the impact of his confession at all, and he has shown nothing suggesting that expert review of the victims' testimony would have cast doubt on their disclosures or his admission to the crimes. In short, he has not shown prejudice under *Strickland*.

14

4. *Failure to request a departure or otherwise seek leniency at sentencing*

Lastly, Stenberg asserts that Antosh provided constitutionally defective representation at sentencing when he failed to request a sentencing departure—or present any mitigating evidence whatsoever—before the district court handed down consecutive life sentences. The district court did not directly address this argument in its findings, concluding that Antosh's alleged failure to perform certain pretrial and posttrial functions is "more like a summary of [Stenberg's] other arguments" and was "not independently argued or supported" in Stenberg's proposed findings.

Yet while the district court was correct that Stenberg's proposed findings did not mention the departure issue, he did raise that question in both his initial motion and at the evidentiary hearing. At the hearing, when Stenberg's attorney questioned Antosh about the issue, Antosh explained that he did not move for a departure or put on mitigating evidence because he felt it would contradict Stenberg's claim of innocence—a claim Antosh was hoping would prevail on appeal if the confession were suppressed.

Like trial, sentencing is an adversarial process, and defendants are entitled to the effective representation by counsel at both proceedings. *Strickland*, 466 U.S. at 686-87. In keeping with this principle, courts have recognized that "'any amount of actual jail time has Sixth Amendment significance'" when determining effectiveness under *Strickland*. *Baker v. State*, 57 Kan. App. 2d 561, 573, 457 P.3d 183 (2019) (quoting *Glover v. United States*, 531 U.S. 198, 199, 121 S. Ct. 696, 148 L. Ed. 2d 604 [2001]), *rev. denied* 312 Kan. 890 (2020).

In Kansas, the sentencing court must impose the presumptive sentence under the sentencing guidelines unless there are substantial and compelling reasons to depart from that presumption. K.S.A. 2020 Supp. 21-6815(a). A successful ineffectiveness claim thus

15

must show a reasonable probability that the sentencing court would have found substantial and compelling reasons for a departure if the defendant's attorney had sought one. See *Bernal v. State*, No. 101,296, 2010 WL 2852543, at *8 (Kan. App. 2010) (unpublished opinion). As in any other case, however, courts must "'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Baker*, 57 Kan. App. 2d at 573 (quoting *Ayestas v. Davis*, 584 U.S. ___, 138 S. Ct. 1080, 1100, 200 L. Ed. 2d 376 [2018] [Sotomayor, J., concurring]).

We can appreciate the fundamental tenet behind Stenberg's assertion—that without seeking a departure, Antosh essentially conceded that Stenberg should receive the presumptive sentence of life imprisonment for each of his convictions. And we also note that, in the absence of any mitigating circumstances, the district court decided to order Stenberg to serve two of these life sentences consecutively. Thus, Stenberg will be ineligible for parole for 50 years. Given his age, that decision likely means that Stenberg will spend the rest of his life in prison.

Moreover, in the absence of any further explanation, we are not persuaded by Antosh's statement that seeking a departure would necessarily cast doubt on Stenberg's innocence. It is true that courts often are reticent to enter sentencing departures when the defendant has refused to take responsibility for his or her crimes. But admitting guilt is not a prerequisite for sentencing departures; instead, courts must assess the particular facts of each case, and the mitigating circumstances offered, to determine whether to depart from the presumptive sentence.

The problem with Stenberg's sentencing claim is that though he critiques Antosh's decision not to seek a departure, he offers no mitigating circumstance or evidence that would have supported a departure. At no time—not in Stenberg's K.S.A. 60-1507 motion, the testimony from the evidentiary hearing, or his brief on appeal—does Stenberg point to any possible mitigating evidence that Antosh should have argued at sentencing. With

16

no proffer as to what evidence might have mitigated his actions or justified a departure, Stenberg cannot show any probability that the district court would have departed or run his sentences concurrently—even if Antosh should have filed a departure motion.

Instead, Stenberg relies heavily on Judge Leben's dissent in *Baker* to argue that a failure to put on—or at least investigate—mitigating evidence is in and of itself ineffective assistance of counsel. 57 Kan. App. 2d at 580-600 (Leben, J., dissenting). But Judge Leben dissented in that case *because* the defendant there had proffered "strong arguments and evidence that could have been presented on [his] behalf" that undermined confidence in his sentence. 57 Kan. App. 2d at 597. Other panels addressing the issue have reached the same conclusion, consistently requiring a proffer of the mitigating evidence that would have been presented. See, e.g., *Brown v. State*, No. 119,112, 2019 WL 638272, at *3 (Kan. App.) (unpublished opinion), *rev. denied* 310 Kan. 1061 (2019); *Bernal*, 2010 WL 2852543, at *8; *In re J.T.P.*, No. 101,162, 2009 WL 1499367, at *6-7 (Kan. App. 2009) (unpublished opinion) (noting that the failure to move for a departure is not itself ineffective assistance without a proffer of mitigating factors).

Without a proffer, it is unclear what evidence Stenberg believes should have been offered to seek judicial leniency at sentencing. Stenberg—who bears the burden to show error—had several opportunities to provide this information to the district court and to this court. His failure to do so leaves this panel without a way to analyze Antosh's alleged deficiency under the *Strickland* analysis. Once again, Stenberg has not apprised this court of any error that requires reversal of the district court's decision.

For all these reasons, we affirm the court's denial of Stenberg's K.S.A. 60-1507 motion.

Affirmed.