IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,448

STATE OF KANSAS,
*Appellee*,

v.

HOWARD R. PRUITT,
*Appellant*.

SYLLABUS BY THE COURT

1.

Prosecutor's statement in summing up testimony about alleged murder weapon, "This seems to be the shotgun, folks. I don't think there's a lot of question about that at this point," was an impermissible personal opinion; but it does not require reversal of the defendant's premeditated first-degree murder conviction.

2.

Prosecutor's statement that the victim deserved jurors' "consideration" was not error, when the context of the statement demonstrates that the prosecutor was not attempting to invoke the jury's sympathy.

3.

Prosecutor's statement, "Folks, if you're convinced beyond a reasonable doubt that those three elements exist, you must find the defendant guilty of murder in the first degree, as he has been charged," was not an impermissible misstatement of the law because it forbade jury nullification.

1

4.

Even if the district judge's failure to instruct sua sponte on reckless second-degree murder and reckless involuntary manslaughter in this case is assumed to be error, the error is not reversible under a clear error standard, when there was overwhelming evidence that whoever shot the victim to death did so by firing a shotgun loaded with triple-aught buck from close range after lying in wait for about 10 minutes, and strong evidence demonstrates that the person who shot the victim was the defendant.

5.

A district judge's instructions to the jury, (a) "Such law you must follow, and you must not substitute for it opinions of your own as to what you think the law should be"; (b) "At the end of the case, I will instruct you on the law that you must apply to the evidence in order to reach a verdict"; and (c) "It is my duty to instruct you in the law that applies to this case, and it is your duty to consider and follow all of the instructions. You must decide the case by applying these instructions to the facts as you find them," are correct statements of the law and not erroneous under *State v. Boothby*, 310 Kan. 619, 448 P.3d 416 (2019). They do not direct a verdict of conviction or prevent a jury from exercising its power of nullification.

6.

The district judge in this case did not abuse his discretion in finding that no fundamental failure due to jury misconduct occurred in the trial of the defendant's case. The judge was able to observe the defendant's daughter, who testified about observing a juror sleeping, and evidently made a negative credibility judgment. The judge also made a careful record of other, unrelated trial participants' recollections, including his court reporter's and his own; and those recollections did not match that of the defendant's daughter.

2

7.

Defendant is not entitled to reversal of his conviction under the cumulative error doctrine.

Appeal from Butler District Court; CHARLES M. HART, judge. Opinion filed December 6, 2019. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Cheryl M. Pierce*, assistant county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.:  This direct appeal by defendant Howard Pruitt raises five challenges to his first-degree premeditated murder conviction for the shotgun killing of Phillip Little.

Pruitt asserts that the prosecutor committed error during closing argument, that the district judge should have instructed the jury on lesser included offenses of reckless second-degree murder and reckless voluntary manslaughter, that the jury's power of nullification was improperly foreclosed by erroneous instructions, that a new trial should have been granted because one juror slept during part of the proceedings, and that his conviction is infected by cumulative reversible error.

We reject all of Pruitt's arguments on error save two, and we conclude that, even if we find one error and assume the existence of another, those two errors do not individually or collectively command reversal of Pruitt's conviction. This is a case in

which the defendant's guilt of first-degree premeditated murder was supported by truly overwhelming evidence. The errors could not have made a difference in the outcome.

FACTUAL AND PROCEDURAL BACKGROUND

Bad blood developed between Pruitt and Little before the fatal shooting. Nathan Coe, aware of their ongoing disagreement and having come to understand that Pruitt was interested in harming or paying someone else to harm Little, called Pruitt on the night of the shooting to let him know that Little was at Skylar Morgan's trailer home.

Coe and his father had been hanging out with Little and others at Morgan's that evening. The others at the trailer were Morgan, Bobbie Myers, and Matthew Kreusel. About 11 p.m., Coe and Myers left to buy liquor, eventually obtaining vodka at the home of Michelle Morris. When they returned to the trailer, they disagreed on whether the correct amount had been paid for the vodka, and Kreusel drove Myers back to Morris' house to settle the issue. This left Coe, his father, and Little awake at the trailer; Morgan was already asleep in his bedroom.

According to Coe, while Myers and Kreusel were gone, he and Little stepped onto the porch of the trailer and Pruitt, who had been waiting outside, immediately fired a shotgun at Little. Pruitt then fled, while Coe ran back into the trailer. Morgan would testify at Pruitt's eventual trial that Coe woke him up and told him Little was dead on the porch. Morgan called 911 and "got everybody in the bedroom because [he] was scared." When Coe asked to borrow Morgan's truck, Morgan told him, "Yeah, take my truck; get out of here. I'm scared; you're scared."

When Myers and Kreusel returned a few minutes later, Morris was with them. As they pulled up, Myers noticed that both Morgan's truck and the car Coe and his father had

4

arrived in were gone. When Myers saw Little lying on the porch, she screamed for Morgan to come help her. Morgan came outside and told her Little had been shot and directed her to "step away."

When El Dorado police officers arrived at Morgan's trailer, they found Little dead on the porch and Morgan, Myers, Kreusel, and Morris at the scene. They soon learned that Coe and his father also had been at the trailer that evening. Eventually, Coe returned; and the officers brought him into their station for an interview.

Coe's story shifted from less to more detailed over the series of interviews that followed. At first he shared only the basics: He heard a "boom" when he left the trailer with Little, realized Little had been shot, went into the trailer and asked to borrow Morgan's truck, and left. His later version of events included his identifications of the gun as a .410 double-barreled sawed-off shotgun and the shooter as Pruitt. He also told law enforcement that Pruitt and Jake Perry had put a "bounty" on Little, which Little had mentioned when they talked at Morgan's. Coe claimed "there had been $5,000 offered" but Little had "laughed it off."

According to the interviewing detective, Coe said

"that he had contacted Mr. Pruitt by telephone and informed Mr. Pruitt that . . . Mr. Little was at the trailer. [Coe] said that he was aware that Mr. Pruitt was . . . looking for Mr. Little. And he had also said that Mr. Little had made comments throughout the evening that he was wanting somebody to bring Mr. Pruitt to him.

. . . .

"He'd explained . . . that the shooter . . . had popped up at the deck and had fired. And . . . that he had r[u]n east."

Coe also said he had not expected Pruitt to bring a gun with him to the trailer. Rather, he thought Pruitt would give Little an "[a]ss-whooping, very minimal."

When the detective questioned Pruitt the same day, Pruitt acknowledged that he and Little had ongoing issues, but he denied shooting Little.

The State charged both Pruitt and Coe in Little's murder. Coe was in custody for 104 days before the charges against him were dismissed with prejudice and he was released.

Investigators were, at least initially, unable to find the gun used in the shooting. After an anonymous Crime Stoppers tip, a sawed-off single-barrel shotgun that, according to the retrieving officer, "looked like a .410" was found in the Walnut River.

When Pruitt's case went to trial, before voir dire began, the district judge outlined for potential jury members how the matter would proceed. The judge's outline included:

"After each side completes its case, I must then instruct you on the law that applies to a given case. Such law you must follow, and you must not substitute for it opinions of your own as to what you think the law should be.

"As jurors, it is your duty to hear the evidence and to determine the facts from the evidence. You are then obliged to apply the law as given to the facts as you find them to be and, thus, to arrive at your verdict."

After voir dire and the parties' opening statements, the district judge provided the jury with preliminary instructions, including:

"Now that you have been chosen as jurors for this trial, you're required to decide the case only on the evidence admitted.

"At the end of the case, I will instruct you on the law that you must apply to the evidence in order to reach a verdict."

In addition to the events described above, trial testimony included Myers' description of Coe's possession of a handgun on the night of the shooting and Kreusel's account of a conversation between Little and Coe, in which Coe said he "would be able to get a lot of money" if he were to "pop [Little] in the head." Little's reaction to this statement, according to Kreusel, was "laid back, drunk, sittin' on the floor."

During cross-examination, Kreusel testified that he received a phone call the day after Little's murder from Coe's wife, in which she said Coe had been "offered money if he were to take [Little] out." Kreusel said his impression was that Coe's wife "had a feeling that he might do it, but . . . she wasn't sure."

During Morgan's testimony at Pruitt's trial, in addition to confirming the facts recited above, Morgan said he knew that Little had been having "a little bit of trouble with [Pruitt]," although he had no details and did not know Pruitt personally. He had not heard Coe make the "pop" statement to Little, but Kreusel told Morgan about it the next morning.

When Coe testified at Pruitt's trial, he admitted he had a gun in the car he was driving on the night of the murder. He described learning that Pruitt had problems with Little the first time he met Pruitt, about six weeks earlier. The problems had to do with Little's behavior toward a woman and Little spray-painting "meth-head" or "meth dealer" or something similar on Pruitt's house. Coe denied that Pruitt had ever suggested someone could make money by hurting or killing Little.

7

The night of the shooting, Coe testified, he called Pruitt within 30 minutes of arriving at the trailer "to let him know the person he had issues with was around." He denied having told Little that "it would be worth a lot of money if [he] popped him right now." When Coe and Little stepped onto the porch of the trailer shortly before midnight, Coe heard a "very, very loud" gunshot immediately. Coe said that he did not realize right away that Little had been hit but that he heard a "ruckus" to his right, turned, and could see Pruitt had been the shooter.

When Coe was asked if Pruitt had ever shown him a gun before the night of the murder, Coe said Pruitt had shown him a "sawed-off double barrel .410 shotgun" purchased from Billy Hise. Coe described the shooter's gun as "identical" to this .410 sawed-off shotgun.

Coe also testified at trial that he had intended to borrow Morgan's truck earlier in the evening and that he did so after the shooting. He said he had not had a chance to ask earlier and was worried that the police who responded to the trailer would discover he had a "warrant . . . for my arrest from a previous incident with my wife."

Several more witnesses testified about the recovered gun and linked Pruitt to it.

Cassandra Maynard described statements made by her ex-boyfriend, Ralph Ballinger. He had told her

> "[t]hat he was working with [Hise] and his younger son changing a tire the night of that and that, uh, a guy named Pops came and asked Ralph if he could drive him to a party so they could scare a gentleman, because . . . he was abusing a woman, supposedly, is what he said. And so he drove him over there and parked a couple blocks away. Um, Pops

went up to the house, came back, told him: 'We need to get out of here.' And Ralph drove off and . . . went back to [Hise's] house, got out, and Pops drove off."

Maynard had never met the person that Ballinger described to her as "Pops."

Ballinger recounted a similar, although not identical, story when he took the stand. The night of the shooting, he was with Hise at the home they shared. Pruitt arrived and asked Ballinger if he wanted to run with him to get gas. Ballinger agreed. "Then [Pruitt] also talked about gettin' to go talk to somebody." Ballinger came with him, "just in case there was—somethin' happened, because he—he wanted to talk to a guy about somethin', and he was, like out-numbered." While they were getting gas, Pruitt's phone rang. "He got a phone call from a guy named Nate. . . . And he said: 'Well, he's home by himself. I wanna go out and talk to him.'" Ballinger denied knowing the identity of the person Pruitt wanted to confront.

Ballinger testified that when he and Pruitt neared Morgan's trailer, Pruitt "got out of the truck and pulled out a gun." Ballinger described the gun as "a little sawed-off .410 open . . . break over gun" that had "a rubber band with a little small shell on top—underneath of it." Ballinger had heard that Pruitt got the gun from Hise. Ballinger said he tried to prevent Pruitt from taking the gun with him to the planned confrontation.

> "I asked him: 'What are you doin'?' He goes: 'I'm just gonna go scare him.' And I told him: 'Ain't no—you don't need a gun to go scare him. You don't need to go threaten him.' He goes: *'I'm just gonna go shoot him in the butt.'* I said: 'You don't need to do that. Please put the gun back. It ain't worth it. Please put the gun back.'" (Emphasis added.)

Pruitt nevertheless took the gun with him. About 10 minutes later, Ballinger heard a gunshot. He then "took off" because he "didn't want no part of it."

9

The third witness who discussed Pruitt's connection to the gun was Perry, who had been Pruitt's roommate and had known Little for several years. Perry testified about the spray-painting incident for which he believed Little to be responsible. Perry also testified that he had been told Little had pulled a gun on Pruitt. The night of the murder, according to Perry, Coe had been at the house Perry and Pruitt shared early in the evening. The prosecutor asked Perry if he had "ever heard Nathan Coe and . . . Howard Pruitt discuss money . . . , say $5,000, to do a job?" And Perry said he had heard Pruitt and Coe say something on the subject as they were leaving the house.

Later that night, Perry said, Pruitt woke him up and said, "'I shot him,'" referring to Little. Pruitt told Perry where to find the gun, a "short shotgun." Perry found the gun where Pruitt told him it would be and threw it over a bridge railing. When Perry viewed photographs of the gun investigators eventually recovered from the Walnut River, he identified the gun pictured as the same one he retrieved and disposed of at Pruitt's direction.

Other testimony in the State's case established that a search of Pruitt's vehicle turned up "a Federal Firearms .410 shotgun shell with a copper-colored projectile at the top of it." In addition, a forensic pathologist testified about the two projectiles recovered from Little's body. The pathologist identified the cause of Little's death as the projectile that had gone through his aorta and trachea.

A Kansas Bureau of Investigation analyst involved in testing the recovered gun told Pruitt's jury about it and other items given to the KBI by the police. Those items included "an unknown polymer item," two live Federal .410 shotshells, and two fired shot pellets. After clean-up, the analyst said, the recovered shotgun was functional. One of the two live shotshells had been connected to the barrel of the gun; the other was found in Pruitt's vehicle. Both shells were "consistent with Federal Personal Defense . . . 410 bore

10

shotshells, and they [were] loaded with four pellets of . . . triple-aught buck." The two fired pellets recovered during Little's autopsy were copper in color and made of copper-plated lead. The "weight and all of the physical characteristics of the[] two pellets [were] consistent with being triple-aught buck."

Kreusel, Coe's attorney, and Pruitt's doctor testified for the defense. Kreusel described the surface conditions surrounding Morgan's trailer, stating that it would not be safe to walk at a "fast pace" through there because of all the potholes. Coe's attorney testified that he had a conversation with Coe about the consequences of the State dropping the charges against him, including that he would no longer have a Fifth Amendment privilege against self-incrimination. Pruitt's cardiologist testified that Pruitt had "symptoms consistent with blockages in the arteries in his legs," which could have affected his ability to walk or run.

At the conclusion of the trial evidence, the district judge instructed the jury on the law of the case.

> "MEMBERS OF THE JURY:  It is my duty to instruct you in the law that applies to this case, and it is your duty to consider and follow all of the instructions. You must decide the case by applying these instructions to the facts as you find them.
>
> "In your fact finding, you should consider and weigh everything admitted into evidence. This includes testimony of witnesses, admissions or stipulations of the parties, and any admitted exhibits. You must disregard any testimony or exhibit which I did not admit into evidence."

The judge's final jury instruction informed the jury that it needed to select a presiding juror and included a description of how to reach a verdict.

11

"When you retire to the jury room, you will first select one of your members as Presiding Juror. The person selected will preside over your deliberations, will speak for the jury in Court, and will sign the verdict upon which you agree.

"Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions.

"Your agreement upon a verdict must be unanimous."

The judge instructed the jury on the charged crime of premeditated first-degree murder and the lesser included crime of intentional second-degree murder. Neither party objected to the language of any instruction or to the giving or omission of any instruction.

During closing argument, the prosecutor discussed the evidence supporting the State's claim that the gun found in the river was the same gun used in Little's murder.

"So identifying this gun, this mystery gun, and the descriptions thereof. Multiple witnesses generally got it right; multiple witnesses generally got it wrong. Green and black camo, or is it brown? Is it single or double barrel? Is—that lever on top, is that a hammer, or is that a release? Well, what we have consistently is everybody said it was kind of a small shotgun, hand-held. Those that identified the width of that barrel called it a .410. 'Or it sounded like a .410' was another comment. And, of course, we have ammunition that seems to back up that there's at least some consistency throughout.

"*This seems to be the shotgun, folks. I don't think there's a lot of question about that at this point.* That .410 was found in the car—the .410 round was found in the car of Howard Pruitt; the gun found in the Walnut River. We've heard the testimony. (Long pause.)

"Uh, it's—it's important to note the KBI tested that firearm; that the firearm was operable. He got it to operate. And by the testimony you heard, that was after it was underwater for six months.

12

"The rubber band was described a couple of different ways. I think it was Nathan Coe that said it was a leather, uh—but it's a wide rubber band, uh, that was holding a .410 shotgun shell to the barrel. *Again, all of that is for your review. So if identification of the gun is an issue, uh, I think that's been resolved.*" (Emphases added.)

After a discussion of the elements of first-degree murder and second-degree murder, the prosecutor mentioned the role Little should play in the jury's deliberations.

"Your options are to find the defendant guilty of first-degree murder; premeditated, intentional murder of Phillip Little on or about August 2nd, 2016.

"Your next option is second-degree murder; that is to say, that he killed him without premeditation. Now, as the attorney for the State, I'm suggesting to you that there is ample evidence of premeditation, but that is your determination to make.

"The third option is not guilty.

"Folks, Phillip Little deserves your consideration, certainly. If you didn't approve of his lifestyle; if you didn't approve of his spray-painting/graffiti work; if you didn't approve of the folks that they hung out with, that's really not the determination to make.

"The question is:  What did Howard Pruitt do that night? What evidence is there to show that he took Phillip Little's life? What evidence is there to show that Phillip Little [*sic*] intended to take Phillip Little's light—life and that he knew exactly what he was doing that night when he went there?"

Finally, the prosecutor concluded his closing argument with directions for the members of the jury, should they be convinced beyond a reasonable doubt of each of the elements of first-degree murder.

13

"Folks, if you're convinced beyond a reasonable doubt that those three elements exist, *you must find the defendant guilty* of murder in the first degree, as he has been charged.

"With that, I thank you very much for your attention." (Emphasis added.)

The jury found Pruitt guilty of premeditated first-degree murder.

Before sentencing, Pruitt moved for a new trial, alleging one of the jurors had been asleep during portions of the trial. At an evidentiary hearing held several months after the trial concluded, Pruitt's daughter testified that she had seen a juror asleep: "[T]he lady couldn't even keep her eyes open. . . . I mean she was nodding out for hours at a time." She said that she had "let [defense counsel] know that [a juror was] fallin' asleep." When she told counsel, i.e., the same lawyer introducing her testimony at the hearing on the motion for new trial, he told her that he could not see the juror because of a lectern in the way. Pruitt's daughter could not identify the juror, although she might have been able to do so right after trial. At the motion hearing, she pointed to an area of the jury box and stated, "in the front, maybe the second or third maybe." She also said: "I honestly—it's almost like—I'm tryin' to think of who it was. I could—maybe that red short spiky-haired girl. But I'm not gonna call somebody out that I don't know 100 percent who it was."

The State questioned Pruitt's daughter, and then the district judge asked her what she did with the information that a juror was sleeping.

> "Uh, the minute recess was in . . . session, I stated to [defense counsel] if I could talk to him. He pulled me in that side room right there (indicating), and I proceeded to tell him she was sleeping and I was wondering how nobody else can see it when I'm in the very back and everybody here (indicating) is in the front. We have a sheriff standing up (indicating). I don't know the legal stance, but, in my eyes, she should have been removed from that second."

14

After hearing arguments from the parties, the district judge put his recollections of trial on the record.

"[A]nd the Court brought to the attention of both, I think, Mr. Jensen and to, uh, the State, Ms. Pierce and Mr. Devinney, that the, uh—myself, um, made observations in regards to viewing of the jury throughout the course of the trial. And, actually, this was a trial that Mrs. Cross, the courtroom bailiff, was in the courtroom the entire trial. It was—it was not just certain parts of the trial she was present. And I made inquiry to her as to if she observed any jurors nodding off, falling asleep, being groggy, and she did not. And I made inquiry to counsel as to how, um, they would like that presented for the record. And I believe that it was, uh, agreed to be appropriate that my statement on the record to the effect that I just made would be appropriate and sufficient."

Both the State and defense counsel acknowledged that they had spoken to other court personnel, and none indicated that a juror had been sleeping. Defense counsel also put his observations and arguments on the record.

"I recall that, uh, I—I believe counsel—I think—I think we had an off-the record discussion, literally right back here (indicating), about the potential problem and, uh, that there was some indication that maybe all was not well. And I mentioned, I—I believe— and I don't think it made the record necessarily, but I want it to now. But I was limited in my ability to do anything about it because of my—literally, because of my location. Because when seated at this desk, uh, there are (long pause) five seats, and they're all at this (indicating) end that I can observe. Uh, and, of course, when I'm not seated, I'm focused on a witness. And, of course, the same thing is true for counsel. So I think we ought to look at this not just in terms of 'Was it seen,' because that doesn't equate to 'Did it happen or not happen?'

"Observations—uh, everybody in this courtroom has a job that would focus their attention away from a juror—uh, the jury on a regular basis, and I'd ask the Court take that into consideration."

At that point in the motion hearing, the district judge took an off-the-record recess to sit in defense counsel's chair and view the jury box from that vantage point. In addition, the judge and counsel met and talked with other court staff. When the hearing resumed, the district judge described the substance of those conversations on the record.

"The Court has taken the opportunity to meet with counsel, uh, myself; uh, our court reporter; and our courtroom bailiff and—for the purpose of confirming, uh, what was . . . previously placed on the record. I believe it's correct to state that there would be no change in the record in regards to [the bailiff's statement]. There's no change in the statement as far as myself, as the judge of the trial, and observances.

"The court reporter . . . has made a statement, and I believe that placing the statement on the record was agreeable to counsel, as opposed to placing, uh, her under oath, as she is an officer of the Court."

The district judge read the court reporter's statement into the record:

"THE COURT: . . .

"'I saw a (lady) juror, (zookeeper), front row, nodding off at the beginning and struggling to keep her eyes open. At the recess, I brought it to the Court's attention. The Court advised he would watch said juror. I don't remember any more instances of nodding off after that.'"

Based on this evidence and the other recorded observations, the district judge rejected Pruitt's claim of juror misconduct.

"Subsequently, the Court (long pause) has found, pursuant to that case law . . . that no contemporaneous objection was made as to an inattentive juror, a type of juror misconduct.

"The Court, subsequently, does find that there does need to be definitive evidence of jury misconduct. The Court has previously . . . stated that, as the judge, there was no inattentiveness by the jurors that I ever detected during the course of the trial; . . . never detected that someone appeared to be asleep or unconscious where due process rights of Mr. Pruitt would have been denied.

"The Court does find that even in the event that there was a struggling or a straining of an individual to remain attentive, that that is not the same as being in— inattentive.

"And, subsequently, the Court finds that the due process rights of Mr. Pruitt have not been denied by any type of juror misconduct . . . in this case . . . that being a juror falling asleep.

". . . [T]he Court . . . does overrule and deny the motion for a new trial."

The district judge then sentenced Pruitt to a hard 25 life sentence.

## DISCUSSION

*Prosecutorial Error*

Appellate review of a claim of prosecutorial error is a two-step process.

"First, the appellate court must decide whether the challenged prosecutorial act falls outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. Only if that error is found, the appellate court moves to the second step of determining whether the error prejudiced the defendant's due process rights to a fair trial,

17

utilizing the constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967). Prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error will not or did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict." *State v. Haygood*, 308 Kan. 1387, Syl. ¶ 3, 430 P.3d 11 (2018).

During closing argument, "a prosecutor may comment on admitted evidence as long as the remarks accurately reflect the evidence, accurately state the law, and are not intended to inflame the jury's passions or prejudices or divert the jury from its duty to decide the case based on the evidence and controlling law." *State v. Anderson*, 294 Kan. 450, 463, 276 P.3d 200 (2012).

Pruitt takes issue with three different statements made by the prosecutor in his case. He asserts that "This seems to be the shotgun, folks. I don't think there's a lot of question about that at this point" was an impermissible personal opinion; that "Folks, Phillip Little deserves your consideration, certainly" was an impermissible appeal to the sympathies of the jury; and that "Folks, if you're convinced beyond a reasonable doubt that those three elements exist, you must find the defendant guilty of murder in the first degree, as he has been charged" was an impermissible misstatement of the law because it forbade jury nullification.

> *"This seems to be the shotgun, folks. I don't think there's a lot of question about that at this point."*

This challenged statement was uttered in the middle of the prosecutor's discussion of consistencies and inconsistencies among witnesses' descriptions of the gun, as well as the forensic evidence about the gun and projectiles. The prosecutor concluded this

discussion with "[a]gain, all of that is for your review. So if identification of the gun is an issue, uh, I think that's been resolved."

As this court has recognized, "the prosecutor's personal views are irrelevant to the task before the jury," *State v. Charles*, 304 Kan. 158, 173, 372 P.3d 1109 (2016), *abrogated on other grounds by State v. Huey*, 306 Kan. 1005, 399 P.3d 211 (2017); and they may constitute a form of unsworn testimony from a law-trained courtroom character likely to be endowed with outsized influence. See *State v. Akins*, 298 Kan. 592, 605, 315 P.3d 868 (2014) (noting jury's tendency to "'overvalue what is effectively unsworn testimony by a highly regarded prosecutor'"). But "[t]he context of a challenged statement matters." *State v. Anderson*, 308 Kan. 1251, 1261, 427 P.3d 847 (2018).

In 2016's *Charles* opinion, this court put prosecutors on notice "that any temptation to say 'I think' should be rebuffed and replaced with 'the evidence shows' or 'I submit' or a similar, less potentially subjectively loaded phrase." 304 Kan. at 175. In *Charles*, the prosecutor had prefaced many of his statements during closing with "I think" or similar phrases. The court concluded that the prosecutor's statements did not fall outside the wide latitude afforded prosecutors because it was "convinced that the 'I thinks' littering the transcripts in this case [were] mere verbal tics." 304 Kan. at 175.

Two years later, in *State v. King*, 308 Kan. 16, 33, 417 P.3d 1073 (2018), this court unequivocally concluded that the prosecutor's statements, "I think there's sufficient evidence for you to find beyond a reasonable doubt that these two defendants . . . committed the following crimes" and "I don't think that excludes him based on the evidence from having committed these crimes" were "impermissible conveyances of the prosecutor's opinion to the jury" rather than mere verbal tics. 308 Kan. at 33. Yet we declined to declare the comments error, "because when the prosecutor made these

statements at King's trial, we had not yet placed prosecutors on notice that such comments were improper." 308 Kan. at 33-34.

The prosecutor in this case does not get the benefit of the same shelter extended to the prosecutor in *King*. *Charles* was decided on April 22, 2016, a year before this case went to trial. Given this court's previous warning against the use of "I think" and the amount of time between publication of *Charles* and the trial in this case, the prosecutor's use of the phrase here qualified as error.

### *"Consideration" for Little*

Pruitt's argument that the prosecutor's statement about "consideration" for Little was error is wholly without merit. This is not a case when the prosecutor was making an appeal to give the victim "justice." See *Anderson*, 294 Kan. at 463; see also *State v. Henry*, 273 Kan. 608, 640-41, 44 P.3d 466 (2002) (improper to ask jury to consider crime's impact on victim's family). Quite the opposite. Here, the prosecutor was merely acknowledging that Little could be viewed unfavorably because of his past misbehavior toward the defendant. Multiple witnesses had testified about the ongoing dispute between Little and Pruitt, and its genesis seemed to lie at Little's feet. Rather than asking the jury to consider the personal characteristics of the victim, the prosecutor asked the jury to ignore those characteristics and focus on whether Pruitt was guilty of murdering Little.

### *Forbidding Jury Nullification*

Pruitt's final challenge to the prosecutor's closing argument relies on the jury's historical power of nullification. See *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 (2014). In Pruitt's view, the prosecutor erred by telling the jury it "must" convict if it was convinced beyond a reasonable doubt that the State had proved the elements of first-degree murder.

20

We have acknowledged that "[j]uries possess the power to decide a case in a manner which is contrary to the applicable facts and law, *i.e.*, the power of jury nullification." *State v. Naputi*, 293 Kan. 55, Syl. ¶ 4, 260 P.3d 86 (2011); see also *State v. McClanahan*, 212 Kan. 208, Syl. ¶ 3, 510 P.2d 153 (1973) (although jury has "raw physical power" to disregard rules of law and evidence, proper "function and duty" of jury to accept rules of law given in instructions by court). But we have consistently rejected defendants' arguments that a jury should be affirmatively or explicitly instructed on its power of nullification. See *Smith-Parker*, 301 Kan. at 164. And our most recent pronouncement on this subject in *State v. Boothby*, 310 Kan. 619, 630, 448 P.3d 416, 424 (2019), made clear that the jury only has this power, not a right.

In *Smith-Parker*, we held that an instruction from a trial judge that a jury "must" or "will" enter a guilty verdict flies "too close to the sun of directing a verdict for the State." 301 Kan. at 164. A "judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt." 301 Kan. at 164.

But an instruction from the court is fundamentally different from a prosecutor's closing argument, and *Smith-Parker* does not dictate an outcome in favor of Pruitt on this issue. Here, the prosecutor merely used the word "must" to summarize and emphasize the ways in which the State's evidence proved the elements of the charged crime. This statement by the prosecutor was not error.

*Reversibility*

Because we have held that the prosecutor's use of "I think" was error, we must move to the second step of analysis and determine whether the error was harmless under *Chapman*. As noted above, "[p]rosecutorial error is harmless if the State proves beyond a

reasonable doubt that the error will not or did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict." *Haygood*, 308 Kan. 1387, Syl. ¶ 3.

The prosecutor's "I think" statements in this case were embedded in the prosecutor's recitation of trial evidence about the gun. They would not have added meaningfully to the appropriate advocacy in the moment—the prosecutor's dispassionate demonstration that any discrepancies in witnesses' descriptions of the gun were minor in contrast to the points on which they agreed that were consistent with the physical evidence. Moreover, although evidence about the gun was an important piece of the State's case, there was abundant other evidence supporting Pruitt's conviction, including his identification by one eyewitness and his confessions to others. The prosecutor's brief indiscretions do not merit reversal.

INSTRUCTIONS ON LESSER INCLUDED OFFENSES

This court applies a four-step analysis to challenges to jury instructions.

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert denied* 565 U.S. 1221 (2012)]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

Pruitt acknowledges in his brief that he did not object to the trial judge's omission of instructions on lesser included crimes of reckless second-degree murder and reckless involuntary manslaughter. Thus, unless Pruitt can show clear error, he is not entitled to reversal on this appeal. See *State v. Garcia-Garcia*, 309 Kan. 801, 819-20, 441 P.3d 52 (2019).

The State and Pruitt agree that reckless second-degree murder and reckless involuntary manslaughter instructions were legally appropriate. See *Plummer*, 295 Kan. at 161 (lesser included crime); K.S.A. 2018 Supp. 21-5109(b)(1) (lesser degree of same crime).

The State and Pruitt disagree on whether the instructions were factually appropriate.

"K.S.A. 2018 Supp. 22-3414 provides that, '[i]n cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (b) of K.S.A. 2018 Supp. 21-5109, and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime.' We recently reiterated that '"lesser included offense instructions must be given when there is some evidence, [viewed in a light most favorable to the defendant,] emanating from whatever source and proffered by whichever party, that would reasonably justify a conviction of some lesser included crime."' *State v. Haygood*, 308 Kan. 1387, 1408, 430 P.3d 11 (2018) (quoting *State v. Seba*, 305 Kan. 185, 204, 380 P.3d 209 [2016]). However, a defendant's unsupported and self-serving statement of intent may not offer enough factual support for an instruction, depending '"on the extent to which the other evidence repudiates the statement."' *Haygood*, 308 Kan. at 1409 (quoting *Seba*, 305 Kan. at 204)." *State v. Gentry*, 310 Kan. 715, 722, 449 P.3d 429 (2019).

Pruitt advances two arguments to support factual appropriateness. The first is evidence-based and the second is statute-based.

23

The evidence-based argument points to Ballinger's testimony that Pruitt only wanted to scare Little and said he intended only to "shoot him in the butt" and asserts it could support a jury verdict that the homicide was reckless. See *State v. James*, 309 Kan. 1280, 1299, 443 P.3d 1063 (2019) (quoting K.S.A. 2018 Supp. 21-5202[j]) (differentiating between degrees of recklessness needed for two crimes; person acts "recklessly," is "reckless" when person consciously disregards substantial, unjustifiable risk "that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation"); see also *State v. Gonzalez*, 307 Kan. 575, 581, 412 P.3d 968 (2018) (outlining requirements of unintentional second-degree murder, reckless involuntary manslaughter). Recklessness is not limited to "blind conduct." See *James*, 309 Kan. at 1299 (quoting *State v. Deal*, 293 Kan. 872, 884, 169 P.3d 1282 [2012]) (even intentional blow can result in unintentional but reckless killing; "'[I]t is not the intent to inflict a blow but the intent to kill that is the focal point' of the distinction between intentional second-degree murder and unintentional but reckless second-degree murder."); see also *Gentry*, 310 Kan. at 727 (evidence reasonably supported theory shooter fired toward truck without intent to kill whoever might be inside).

Pruitt's statutory argument relies on K.S.A. 2018 Supp. 21-5202(c), which reads:

"Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. If recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally. If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally."

Pruitt interprets this language to have required the lesser included instructions he argues for here. In his view, under this subsection of the culpable mental state statute,

24

because the State takes the position that the evidence was factually sufficient to support premeditation and intentional conduct, the same evidence had to be factually sufficient to support reckless conduct.

We need not revisit the propriety of previous decisions of a majority of this court that a specific instruction was factually appropriate when there was some evidence to support it. See *Plummer*, 295 Kan. at 162 (standard "'closely akin'" to sufficiency of evidence standard). But see *State v. Williams*, 308 Kan. 1439, 1463, 430 P.3d 448 (2018) (Rosen, J., concurring) (questioning propriety of applying sufficiency test to lesser included crime instructions, emphasizing some evidence must be enough to "'*reasonably justify*'" conviction of lesser offense). Nor do we need to parse the language of the statute in this case. Even if we assume district court error in failing to give the two reckless homicide instructions, the error cannot possibly qualify as clear and thus reversible.

Laying aside for the moment the two brief segments of Ballinger's testimony that Pruitt uses to support factual appropriateness, the rest of the evidence in this case is overwhelming that whoever shot Little to death did so by firing a shotgun loaded with triple-aught buck from close range after lying in wait outside Morgan's trailer home for about 10 minutes. This makes this case very nearly a law school paradigm for premeditated murder by someone, and we have already referenced the strong evidence that the someone was the defendant. No instruction on reckless second-degree murder or reckless involuntary manslaughter would have affected the outcome here.

INSTRUCTION REGARDING JURY NULLIFICATION

Pruitt's next challenge on this appeal concerns statements made by the trial judge in instructions before voir dire, introductory instructions before the State opened its case

in chief, and at the conclusion of trial. These statements, Pruitt asserts, "undercut the jury's inherent right to nullification."

We apply the same four-step analysis to this jury instruction challenge that we set forth above.

To recap Pruitt's bothers on this nullification point, the district judge told prospective jurors before voir dire that he would instruct the eventual jury on the law of the case and "[s]uch law you must follow, and you must not substitute for it opinions of your own as to what you think the law should be." In introductory instructions after the jury was seated, the judge said, "At the end of the case, I will instruct you on the law that you must apply to the evidence in order to reach a verdict." In final jury instructions given at the close of the evidence, the judge gave PIK Crim. 4th 50.040 (2012), which said, "It is my duty to instruct you in the law that applies to this case, and it is your duty to consider and follow all of the instructions. You must decide the case by applying these instructions to the facts as you find them."

*Boothby* held that a jury instruction saying, "'Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions,' is legally correct and does not prevent a jury from exercising its power of nullification." 310 Kan. 619, Syl. ¶ 3. The same instruction was given in this case, and it is not among those challenged by Pruitt. On the instructions he does challenge, Pruitt relies on arguments similar to those advanced by the defense in *Boothby*. He asserts that the three instructions in issue essentially directed a verdict to convict.

As alluded to in connection with Pruitt's related prosecutorial error issue above, we stressed in *Boothby* that there is no "right" to jury nullification. *Boothby*, 310 Kan. at 630. And the jury's power to nullify need not be emphasized or even spelled out

26

explicitly. See *Smith-Parker*, 301 Kan. at 164. The danger to be avoided in jury instructions is directing a verdict, a danger the *Smith-Parker* trial judge's reasonable doubt instruction telling the jury it "*will* enter a verdict of guilty" did not do enough to avoid. (Emphasis added.) See 301 Kan. at 164. The same concern was not present in *Boothby*, see 310 Kan. at 630-31, and it is not present here. The three instructions Pruitt challenges generally informed the jury how it would proceed in resolving the issues in the case; they reinforce the jury members' oaths; they did not tell the jury that it "must" or "will" enter any particular verdict.

Pruitt's challenge to these jury instructions is without merit.

MOTION FOR NEW TRIAL

Pruitt also challenges the district judge's denial of his motion for new trial based on his daughter's testimony that she saw a juror "nodding out for hours at a time."

We generally review a denial of a motion for new trial for an abuse of discretion. *State v. Phillips*, 309 Kan. 475, 477, 437 P.3d 961 (2019). For issues of juror misconduct, however, an appellate court applies a bifurcated review.

"When considering whether a new trial is warranted based on juror misconduct, the trial court first considers whether there was a fundamental failure in the proceeding. If a fundamental failure did occur, the trial court moves to the second step and considers whether the party benefitting from the failure has shown the trial can continue without an injustice, meaning the party has shown beyond a reasonable doubt that the failure did not affect the outcome of the trial. An appellate court reviews the trial court's decision in two parts. It reviews the conclusion on whether a fundamental failure occurred for an abuse of discretion. As for the second question—whether any failure resulted in injustice—an appellate court does not review the district court's decision for abuse of discretion but

27

considers the entire record and performs its own constitutional harmless error review."
*State v. Jenkins*, 308 Kan. 545, Syl. ¶ 3, 422 P.3d 72 (2018).

A district judge may abuse his or her discretion if a decision is based on an error of law; based on an error of fact; or is otherwise arbitrary, fanciful, or unreasonable. *State v. Gonzalez-Sandoval*, 309 Kan. 113, 126-27, 431 P.3d 850 (2018).

This court has addressed the issue of sleeping or inattentive jurors on multiple occasions and has "routinely held that the purported sleeping of a juror did not warrant a new trial." *State v. Armstrong*, 299 Kan. 405, 442, 324 P.3d 1052 (2014) (listing cases).

In *Armstrong*, defense counsel asked to approach the bench during the State's examination of a witness and informed the judge that he believed one of the jurors was falling asleep. The judge thanked counsel and asked the jury to take a break to stretch. After a second instance of alleged juror misconduct, defense counsel asked for a mistrial. The district judge denied the motion, noting that the issue of the "drowsy juror" had been addressed in a timely manner and "that the juror had been struggling but did not actually nod off." 299 Kan. at 440-41.

This court upheld the denial: "[T]here [was] no basis to conclude the trial court erred in finding there was not a fundamental failure in the proceeding because of juror inattentiveness." 299 Kan. at 442. In other instances, the court has acknowledged, "if sufficiently severe," juror inattentiveness could serve as the basis for a mistrial. 299 Kan. at 442; see also 59 A.L.R.5th 1, §2[a] ("Certainly, a juror who has not heard all the evidence in a case or the court's instructions as to applicable principles of law is grossly unqualified to render a verdict.").

The *Armstrong* court compared the facts before it to those in *State v. Kirby*, 272 Kan. 1170, 1196-98, 39 P.3d 1 (2002),

"where the inattentiveness of two jurors was brought to the attention of the trial court. In addressing the issue, the judge stated, '"[I]t did appear that [the juror] may have nodded off for a moment, and I think we took that appropriate action."' This court held that the trial court did not abuse its discretion in denying the defendant's motion for a new trial because there was no statement by the juror that he did not hear testimony, the trial court kept a close eye on the juror and took a recess when it appeared that the juror was dozing off, and the length of time the juror dozed was momentary and isolated. 272 Kan. at 1197-98.

"Similarly, in this case, although defense counsel stated he 'thought' he saw a juror falling asleep, the judge stated, 'I think she was struggling a bit, but I don't know that I ever saw her really nod off.' Also, there was no evidence the juror did not hear testimony. Further, the trial court took immediate action, and there is nothing in the record to indicate any other incidents during the long trial. Finally, if the juror missed any testimony at all, it was testimony regarding the general procedures used by the fire and tool mark expert and was not specific to the evidence in this case. The trial court took steps to assure the juror was attentive before the expert began to testify about his testing or conclusions regarding the evidence gathered at the scene of [the] shooting." *Armstrong*, 299 Kan. at 443.

The district judge in this case found no misconduct and thus no fundamental failure of the proceedings necessitating a new trial. We cannot hold that this constituted an abuse of discretion. The judge was able to observe Pruitt's daughter as she testified and evidently made a negative credibility judgment; this is not particularly surprising, given her inability to identify the juror and the potential for bias in favor of her father. The judge also made a careful record of other, unrelated players' recollections, including his court reporter's memory of a single incident early in the trial when she told him about a jury member struggling to stay awake. The court reporter also recalled that she had

29

alerted the judge to the issue and been told that he would watch that juror. At the hearing on the motion for new trial, the judge noted that he had not personally witnessed or detected any "inattentiveness" among the jurors and "never detected that someone appeared to be asleep or unconscious."

On this record, we hold that the district judge did not abuse his discretion in determining that there was no juror misconduct constituting a fundamental failure of the proceedings.

## CUMULATIVE ERROR

Cumulative trial errors may require reversal if, under the totality of the circumstances, the errors substantially prejudiced the defendant and resulted in an unfair trial. If there is no error or only a single error, cumulative error cannot supply a basis for reversal. See *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017).

This opinion has identified one instance of prosecutorial error; it has assumed error in the failure to instruct sua sponte on reckless second-degree murder and reckless involuntary manslaughter. The prosecutor's improper expression of personal opinion that he thought the identity of the gun had been resolved was a discrete error that in no way compounded the instructional errors. See *James*, 309 Kan. at 1311. In light of the strength of the evidence produced by the State, the errors did not cumulatively prejudice Pruitt, and they did not deprive him of a fair trial.

## CONCLUSION

For all the reasons discussed above, we affirm the judgment of the district court.

JEFFREY E. GOERING, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Goering was appointed to hear case No. 118,448 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court created by the retirement of Justice Johnson.